In the Matter of the ESTATE OF Mary Beverly ELLIOTT; a/k/a Beverly Elliott, a/k/a Mary Elliott, Deceased.

No. 99SA306.

Supreme Court of Colorado,
En Banc.

Feb. 14, 2000.

Renée V. Cooper, Denver, Colorado Attorney, for Petitioner, Darlene Lee Robinson.

Hanna M. Warren, Englewood, Colorado, Attorney for successor, Personal Representative, Phillip Gene Elliott.

Justice RICE delivered the Opinion of the Court.

We issued a rule to show cause pursuant to C.A.R. 21 in this case to determine whether the probate court abused its discretion when it held Petitioner Darlene Lee Robinson in contempt and ordered her incarcerated indefinitely. We now hold that the probate court abused its discretion when it ordered Petitioner to be incarcerated indefinitely in a remedial contempt proceeding without complying with Colorado Rule of Civil Procedure 107. We direct the probate court judge to disqualify herself to allow for the substitution of another judge to adjudicate contempt proceedings in accordance with this opinion.

## I. Facts and Procedural History

On August 23, 1997, Mary Beverly Elliott (decedent) died leaving two surviving adult children, Phillip Gene Elliott (Elliott) and Darlene Lee Robinson (Robinson). On February 9, 1998, the Denver Probate Court issued an Order of Intestacy, Determination of Heirs, and Formal Appointment of Personal Representative. The probate court found that the decedent died intestate and left two heirs, Elliott and Robinson, who each would receive fifty percent of the decedent's estate. The court appointed Robinson as Personal Representative. The estate consisted of personal property, including some furniture, two automobiles, dishes, and jewelry; a bank account containing several thousand dollars; and the decedent's house, located in Denver, Colorado.

According to Elliott, he and Robinson disagreed about the action to be taken regarding the decedent's home, where Elliott had resided prior to the death of the decedent. On July 31, 1998, Robinson sold the house for $134,900. After paying closing costs, attorney fees, a real estate fee, and a debt owed to Sears, Robinson received a check at the closing for $102,409.62. Robinson deposited the check in her personal bank account.

On August 14, 1998, Elliott filed a Petition for Supervised Administration. On December 15, 1998, Elliott filed a Motion for Removal of Personal Representative.

The probate court scheduled a hearing for February 8, 1999, but Robinson did not appear. At the hearing, the court appointed Elliott as successor personal representative. In addition, the probate court issued orders for Robinson to turn over to Elliott all property and assets belonging to the estate of the decedent and to file an accounting of all of the estate assets.

On February 23, 1999, Elliott filed a verified motion for citation of contempt of court, pursuant to C.R.C.P. 107, requesting that the court issue an order to show cause why remedial and punitive sanctions for contempt should not be imposed against Robinson for failure to comply with the court's February 8 order.

On February 26, 1999, the court issued a citation for contempt of court pursuant to C.R.C.P. 107, directing Robinson to appear on April 14, 1999, and show cause why she should not be punished for failing to comply with the court's February 8 order. The citation was personally served upon Robinson.

On April 14, 1999, Robinson again failed to appear for a hearing before the court. On May 14, 1999, the probate court ordered that a bench warrant be issued for the arrest of Robinson due to her failure to appear. On May 17, 1999, Robinson was arrested and placed in Denver county jail.

On May 25, 1999, Robinson, still in custody, was brought before the probate court for a hearing on the contempt citation. Robinson was not represented by counsel nor was counsel appointed for her. Elliott was present with an attorney, Hanna Warren. The court began the hearing by stating:

> Mrs. Robinson, you are here today because the estate of [the decedent] has not been administered properly. And it's my belief that you may have stolen property from that estate, and we are going to recover the property.... Ms. Warren is going to take some testimony from you to see if we can locate the estate of [the decedent]."

Warren attempted to begin questioning Robinson by handing her some documents relating to the estate. Robinson stated that she did not understand what Warren was handing her, and that her brother, Elliott, had "taken things." The court responded, "You are in an awful lot of trouble with me. And you are going to be in an awful lot of trouble with the District Attorney's office if we don't get this matter straightened up." Robinson indicated that she would cooperate.

Warren proceeded to ask Robinson a number of questions regarding the location of the money from the sale of the decedent's house. Robinson answered the questions asked of her, but frequently she responded that she did not know the answer or could not remember. When the court asked Robinson about a check for $72,000 made out to herself and her daughter, she replied, "I am not answering on that because it won't make sense the way you are saying it. I will get upset and nothing will be solved because my brother's [sic] stole a whole bunch of things.... Take me and lock me up because I don't want to go through this." The court replied, "That's what you want to do with the rest of your life is spend it in jail?" Robinson responded, referring to the $72,000, "It's gone. You do what you have to do. I cannot help it." The court responded, "Mrs. Robinson, it isn't my desire to see you spend the rest of your life in jail." When asked about the remainder of the assets, Robinson stated, "I kept it. Then I kept all of it – all of it. And it's gone. So you do what you have to do, Judge, because I can't help it."

The court ascertained from Robinson's testimony that she spent $25,000 on a condominium and gave most of the remaining money to her two adult children and other people. Robinson stated that she had no bank accounts, certificates of deposit, savings accounts, stocks or bonds, cash, annuities, or other income. The court then stated to Robinson, "You understand that $102,000 belongs to the estate and needs to be restored to the estate," to which she replied, "Well, how—I don't know how to get it."

The judge informed Robinson that she was going to remand her to the custody of the Sheriff until she delivered the $102,000.00. The following dialogue took place:

> Robinson: That will be never. So you might as well say forever because you can't – you are a judge. You have power. You are not God, and you can't make something appear that I don't have, so.
>
> Court: Well, perhaps you ought to talk to some of the people you gave the money to.
>
> Robinson: I'm not. It's gone. It's gone.
>
> ....
>
> Court: Well, Mrs. Robinson, at the moment you have possession of a hundred and two thousand dollars –
>
> Robinson: I don't either.
>
> Court:—that belongs – listen to me.
>
> Robinson: It's gone.
>
> Court: Shut up.
>
> Robinson: It's gone.
>
> Court: I have told you to be quiet. Now shut up. I have been working on this estate for two years. And at the moment, a hundred and two thousand dollars is missing. We are going to get this money back in this estate. I don't care whether you have to call everybody that you gave money to. I suggest you take up a collection; because until you free yourself from the contempt, you are going to spend every night in jail until I get that money back. Do you understand me?
>
> Robinson: Well, I will stay in jail then.

Court: All right. Fine. That's your decision, Mrs. Robinson.

Robinson: Okay. They had hostages in Kuwait. They might as well have one here. You can't make me have something I don't have. It's gone.

The judge then adjourned court and had Robinson taken into custody by the Sheriff and imprisoned.

Following the contempt hearing, the probate judge prepared a letter to the office of the district attorney, recommending criminal prosecution of Robinson.

On June 4, 1999, Robinson, through recently retained counsel, filed a request for her immediate release, asserting that she had complied with the February 8 order which directed her to provide an accounting and turn over the assets of the estate to Elliott.

On June 29, 1999, the court held a hearing to rule on Robinson's request for release. At the hearing, Robinson's counsel stated that she had filed an accounting of personal property and money received from the sale of the house. Counsel argued that Robinson was in compliance or was attempting to comply with the February 8 order, stating that Robinson was not in possession of the $102,000. The probate court queried counsel regarding whether the condominium was being sold, and counsel responded that the condominium was not on the market at that time because title had been transferred to Robinson's daughter subsequent to Robinson's arrest and incarceration on May 17, and that Robinson could not have visitors in order to arrange the sale of the condominium. In response to the court's question about what had been done to "generate the $102,000" owed to the estate, counsel stated that "there is an accounting. And she is willing to sell the property to pay." Counsel continued, "Ms. Robinson is not in possession of that money at this time, almost a year and a half later. We did ... file an accounting to show the Court where the money went and in the motion stated that she would be willing to sell the house. [Robinson] doesn't believe at any time she's ever said that she had a hundred and two thousand in her possession.... And if [her family] had the money,

they'd be more than willing to turn it over to the Court to secure her release." When the court stated in response that "it was presented here in the Court that at the time of the closing on the house, a hundred and two thousand dollars was delivered to the estate," counsel responded, "That's correct, [but][r]ightly or wrongly, [Robinson] does not have the money at this time and is willing to sell the condo. The accounting for the money, it specifically says where large sums of the money went, as well as some of the property that was listed." The court replied:

I have advised her before that if I had stolen a hundred and two thousand dollars and had given some of it to friends or family members or spent it on cars or clothes or houses, I would make some effort to demonstrate to the Court that I was trying to get some of that money back by holding some sales.

Counsel responded that there was not much that could be done while Robinson was being incarcerated; that Robinson had attempted to make an accounting, including a filing of bank statements from August 1998 through March 1999 and a listing of assets of personal property; and that she was trying to raise the $102,000 in order to secure her release from jail. Counsel stated that Robinson did not have the ability to comply with the court order, but that she was attempting to do so by arranging to sell the condominium and by making an accounting.

The probate court then questioned whether money had been sought from Robinson's son and daughter, referring to a possible garnishment of their wages and stating that Robinson's daughter may be an accomplice to a crime. The court questioned counsel regarding how much she was being paid, and counsel responded that she was not being paid because Robinson had no funds. The court then stated: "I have to tell you, ... I don't find [Robinson's] testimony credible. I think she could easily get her hands on this money and that she has not. She has chosen not to do it out of spite toward her brother, and that is the basis of the Court order of contempt." The court then suggested ways in which Robinson could remedy the situation, such as reselling automobiles and

clothes, and seeking wage garnishment orders against her son and daughter.

On June 30, 1999, the probate court entered an order denying Robinson's request for relief, finding that "Robinson and her children, particularly her daughter, have the capacity to restore to the estate account substantially all of the funds that were improperly taken by Darlene Robinson." She ordered that Robinson remain in the custody of the Sheriff and directed that she have no visitors except her attorney, no telephone use except to communicate with her attorney, and no television.

On August 30, 1999, Robinson filed a Petition for Relief in the Nature of a Writ of Prohibition pursuant to C.A.R. 21 and a Request to Stay Execution and for the Immediate Release of Robinson pending resolution of the petition. Robinson alleged that the probate court abused its discretion when it imprisoned her. Robinson argued that she was not advised of her rights, was not appointed counsel, and no sworn testimony was taken on the matter. In addition, Robinson asserted that the probate court erred when it imprisoned her on contempt grounds because she had no present ability to comply with the court's order to purge herself of the assets from the estate, citing to *People v. Lockhart*, 699 P.2d 1332, 1336–37 (Colo.1985).

On August 31, 1999, this court issued an order and rule to show cause pursuant to C.A.R. 21, granting Robinson's request to stay execution and request for her immediate release and directing the probate court and Phillip G. Elliott to answer in writing why the relief requested should not be granted.

On September 9, 1999, the probate court answered the order and rule to show cause, stating that it held Robinson in contempt and ordered her imprisoned pursuant to section 15–12–723, 5 C.R.S. (1999). Elliott also filed a response to the order and rule to show cause, stating that Robinson could comply with the contempt order by recovering from her children the money she gave to them and by selling her condominium.

## II. Order of Contempt

Contempt proceedings are conducted under C.R.C.P. 107. Rule 107 distinguishes between two types of contempt, direct and indirect, and two types of sanctions, punitive and remedial. In the present case, the contempt proceedings were initiated pursuant to C.R.C.P. 107, based on alleged behavior by Robinson that occurred outside of the presence of the court; accordingly, such proceedings are guided by indirect contempt procedures. *See* C.R.C.P. 107(a)(3).

A finding of contempt is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *See Tipton v. City of Lakewood*, 198 Colo. 18, 21, 595 P.2d 689, 691 (1979); *In re Marriage of Roberts*, 757 P.2d 1108, 1110 (Colo.App.1988). However, a judge's power of contempt must be used with caution and self-restraint to protect the rights of litigants and the administration of justice, not to protect his or her own dignity. *See Thrap v. People*, 192 Colo. 341, 343–44, 558 P.2d 576, 577–78 (1977).

The probate court imposed remedial sanctions[1] in an effort to compel Robinson to comply with the court's order that she purge herself of the assets belonging to the Elliott estate. The imposition of remedial sanctions is regulated by C.R.C.P. 107(d)(2), which reads:

> In a contempt proceeding where remedial sanctions may be imposed, the court shall hear and consider the evidence for

---

1. Although the probate court did not explicitly state that it was applying remedial sanctions, rather than punitive sanctions, we conclude that the sanctions were remedial because "[a] contempt order in which punishment is conditioned upon future performance of a duty is remedial in nature." *In re Marriage of Zebedee*, 778 P.2d 694, 698 (Colo.App.1988). In order for a court to impose punitive sanctions, the court must advise the contemnor of certain rights, such as a right to counsel and a right to have the contempt proceeding heard by another judge. In addition, the court must make express findings that the contemnor's conduct was offensive to the authority and dignity of the court and must order imprisonment for a definite period. *See Lobb v. Hodges*, 641 P.2d 310 (Colo.App.1982). The probate court did not follow these requisite measures for punitive contempt sanctions—it did not appoint counsel to Robinson, inform her of her right to have the proceeding heard by another judge, make express findings that Robinson's conduct was offensive to the court, or order incarceration for a definite period of time.

and against the person charged and it may find the person in contempt and order sanctions. The court shall enter an order in writing or on the record describing the means by which the person may purge the contempt and the sanctions that will be in effect until the contempt is purged. In all cases of indirect contempt where remedial sanctions are sought, the nature of the sanctions and remedies that may be imposed shall be described in the motion or citation.... If the contempt consists of the failure to perform an act in the power of the person to perform and the court finds the person ḫas the *present ability* to perform the act so ordered, the person may be fined or imprisoned until its performance.

*Id.* (emphasis added).

█ Case law has emphasized the requirement that when remedial sanctions are imposed, the court must make findings of fact regarding the actions constituting the contempt and the *present* duty and ability to perform the acts required to purge oneself of contempt. *See In re Interest of Murley,* 124 Colo. 581, 583, 239 P.2d 706, 708 (1951) (where parent unable to make support payment, no contempt occurred); *In re Marriage of Zebedee,* 778 P.2d 694, 697 (Colo. App.1988) (holding that "[b]efore a contempt order can enter under C.R.C.P. 107(c), the court must find that the contemnor had the ability to comply with its order"); *In re Marriage of Crowley,* 663 P.2d 267, 268 (Colo.App.1983) (holding that contempt proceeding must be dismissed where there is no refusal to perform ordered act because there is no present ability to do so).[2] The burden of proving a present inability to perform rests with the contemnor. *See In re Marriage of Lamutt,* 881 P.2d 445, 447 (Colo.App. 1994) (holding that husband has burden of proving inability to pay child support once

wife proves husband's failure to make payments).

### A. No Evidence of Present Ability to Pay

Robinson contends that the probate court abused its discretion when it found her in contempt because: (1) she complied with the court order inasmuch as it was in her power to do so; and (2) it was not within her ability to comply any further with the order, namely, to return the missing $102,000 to the personal administrator, because she did not have the money.

█ We review whether the trial court's findings concerning Robinson's ability to return the assets of the estate to Elliott, and thus purge herself of contempt, were clearly erroneous. Colorado Rule of Civil Procedure 52 provides in relevant part: "In all actions tried upon the facts without a jury ... [f]indings of fact shall not be set aside unless clearly erroneous...." C.R.C.P. 52.

The May 26 probate court order finding Robinson in contempt stated, "The Court FINDS that Darlene Robinson has the ability to comply with the Court's Order by recovery of the assets and restoration of the estate as ordered by the Court." There is no evidence in the record, however, to support this finding. Particularly, statements made by Robinson and the probate court during the two hearings clearly indicate that Robinson had no present ability to comply with the contempt order.

Even though her testimony at the May 25 hearing was at times unfocused and emotional, Robinson repeatedly told the court that she was not in possession of the estate money. In addition, her answers to the questions asked by Elliott's attorney sufficiently explained how she disposed of the money

---

**2.** In a remedial contempt action, an individual's purported bad faith or self-induced inability to pay does not alter the factual determination that the individual does not maintain a present ability to pay. *See Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 782 n. 7 (9th Cir. 1983) (Under the federal equivalent of Colorado's remedial contempt, it is clear that inability to pay is a complete defense to the charge even if the inability is self-induced.). This is because absent

a finding that the individual has the present ability to perform, the basis for the contempt order—the court's lawful attempt to compel an action—is without foundation. *Cf. United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action.").

from the estate.[3] Robinson declared a number of times that she had virtually no assets left from the estate, other than the condominium that she purchased for herself and a storage locker of personal property from the decedent's house.[4] The court appeared to accept this testimony as true, because the court itself made several remarks that indicated it believed Robinson both had spent the money from the estate and had given the remainder away to her children and friends. The court, for instance, stated, "perhaps you ought to talk to some of the people you gave the money to," and "I don't care whether you have to call everybody that you gave money to. I suggest you take up a collection; because until you free yourself from the contempt, you are going to spend every night in jail until I get that money back." Despite the court's acknowledgment that Robinson was no longer in possession of the money belonging to the Elliott estate, the court ordered her jailed until she restored the missing $102,000.

On June 18, 1999, Robinson's attorney filed an accounting, detailing how Robinson expended the estate assets, and a request for a hearing regarding her compliance with the February 8 order. Robinson stated in the accounting that she does not have any large sums of money at her disposal and that she supports herself through social security disability payments.

In response to Robinson's request for release and filing of an accounting, a second hearing was held on June 29, 1999. Robinson's counsel stated that Robinson had taken substantial steps toward purging herself of contempt by filing an accounting of the personal property in her possession and the money received from the sale of the decedent's house. She also noted that Robinson was willing to sell her condominium, but that she had been unable to do so because the property was in her daughter's name.[5] The court again acknowledged through its comments that it did not believe that Robinson was in possession of the estate money. The court said, "I have advised [Robinson] before that if I had stolen a hundred and two thousand dollars and had given some of it to friends or family members or spent it on cars or clothes or houses, I would make some effort to demonstrate to the Court that I was trying to get some of that money back by holding some sales." These statements by the probate court acknowledging that Robinson had spent or given away the majority of the estate, in addition to Robinson's own testimony that she did not have the funds, lead us to conclude that the probate court was aware that Robinson was not in possession of the estate funds and therefore did not have the present ability to return the missing assets. Thus, based on our review of the record, we conclude that the probate court's findings that Robinson had a present ability to turn over the assets of the Elliott estate are clearly erroneous and we reject them. See C.R.C.P. 52; *Trinidad Sch. Dist. No. 1 v. Lopez*, 963 P.2d 1095, 1104 (Colo.1998); *Arapahoe County Bd. of Equalization v. Podoll*, 935 P.2d 14, 18 (Colo.1997) ("Ordinarily, we will defer to the district court's findings of fact unless they are clearly erroneous and not supported by the record.").

### B. Ability to Purge Must Lie With Contemnor

Both the probate court and Elliott focus a great deal on the fact that Robinson could request money from her children or seek judgments garnishing their wages. For example, the court stated in its June 30 order denying Robinson's request for release, "The Court FINDS that Darlene Robinson *and*

---

3. We note that Robinson did not have the benefit of an attorney at this hearing to aid her in ensuring that all questions were fully and adequately answered. Despite her lack of counsel, however, Robinson did sufficiently explain the disposition of the estate assets.

4. The record indicates that Robinson turned over control of the storage locker, which contained the personal property of the decedent's estate, to Elliott in April 1999.

5. Robinson's ability to purge herself of contempt was made even more difficult by the fact that she was not allowed visitors prior to the June 29 hearing due to her confinement in the medical ward for various medical problems. After the June 29 hearing, the probate court forbade by order any visits or telephone calls from anyone other than her attorney.

*her children, particularly her daughter*, have the capacity to restore to the estate account substantially all of the funds...." (Emphasis added.) While this may be true, it does not establish in any way that Robinson had a *present ability* to turn over the estate assets.[6] A past or future ability to comply are not sufficient grounds for a remedial contempt order. *See McVay v. Johnson*, 727 P.2d 416, 418 (Colo.App.1986) (holding that the trial court erred in issuing a remedial contempt order after finding husband had past but no present ability to pay); *People v. Razatos*, 699 P.2d 970, 975 (Colo.1985) (holding that the record did not support remedial contempt order because it did not establish defendant had the ability to pay the ordered restitution at the time of the hearing).

### C. Section 15–12–723 Is Inapplicable

Although the contempt order was issued pursuant to C.R.C.P. 107, the probate court alleged in its answer to the order and rule to show cause that it held Robinson in contempt pursuant to section 15–12–723. Section 15–12–723 states that upon a written complaint that assets have been concealed or embezzled from an estate the probate court may

> cite such suspected person to appear before it and may examine him on oath upon the matter of such complaint. If the person cited refuses to appear and submit to such examination or to answer such interrogatories as may be put to him touching the matter of such complaint, the court may, by warrant for the purpose, commit him to the county jail until he complies with the order of the court.

*Id.* This statute authorizes a court to jail an individual for failing to appear before the court or failing to answer interrogatories regarding a complaint. However, the court did not issue the order to show cause pursuant to section 15–12–723; rather, by its own order, the probate court clearly stated that the purpose of the contempt order was to compel Robinson to turn over the assets of the Elliott estate, a remedy governed by Colorado

Rule of Civil Procedure 107, not by section 15–12–723. In fact, section 15–12–723 does not provide for remedial sanctions of the type ordered by the probate court. Accordingly, the contempt order and remedial sanctions imposed by the probate court must comply with C.R.C.P. 107.

Thus, we hold that the probate court abused its discretion when it found that Robinson had the present ability to turn over the assets of the Elliott estate and ordered remedial sanctions pursuant to C.R.C.P. 107.

### III. Substitution of Probate Court Judge

■ It is incumbent upon the courts to "meticulously avoid any appearance of partiality, not merely to secure the confidence of the litigants immediately involved, but 'to retain public respect and secure willing and ready obedience to their judgments.'" *People v. District Court*, 192 Colo. 503, 507–08, 560 P.2d 828, 831–32 (1977) (quoting *Nordloh v. Packard*, 45 Colo. 515, 521, 101 P. 787, 790 (1909)). If an appearance of partiality exists, it is incumbent upon a judge to disqualify herself from the proceedings. *See generally* C.R.C.P. 97; C.J.C. Canon 3. When a judge becomes "embroiled in a running controversy" with an individual being held in contempt, it becomes necessary for that judge to recuse herself and permit another judge to adjudicate the issue of contempt. *Taylor v. Hayes*, 418 U.S. 488, 501–02, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974). Whether a judge evidences a lack of impartiality is a question of law; accordingly, our review is de novo. *Cf. Wilkerson v. District Court*, 925 P.2d 1373, 1376 (Colo.1996) (stating that trial judge's decision regarding legal sufficiency of motion for recusal is a question of law, subject to de novo review); *see In re Marriage of Murray*, 128 Wis.2d 458, 383 N.W.2d 904, 907 (App.1986).

■ Here, we look at the transcripts of the two hearings held before the probate court to conclude that the probate judge adjudicating the contempt proceeding against Robinson prejudged Robinson's guilt[7] and

---

**6.** Issues regarding judgments against Robinson or her family members and wage garnishment orders are not the within the purview of the contempt hearing; rather, they are issues more

appropriately addressed in a separate civil or criminal action against Robinson.

**7.** *See Murray*, 383 N.W.2d at 907 (ordering substitution of judge where trial judge stated at the

allowed "marked personal feelings" toward Robinson to affect her judgment in the proceedings. *Taylor*, 418 U.S. at 503, 94 S.Ct. 2697; *see also SEC v. Simpson*, 885 F.2d 390 (7th Cir.1989) (holding disqualification warranted where a party's allegedly unruly conduct provoked the judge to become personally embroiled). At the beginning of the May 25 hearing, the judge stated to Robinson, "[I]t's my belief that you may have stolen property from that estate, and we are going to recover that property." Then, a short time into in the hearing, the judge told Robinson, "You are in an awful lot of trouble with me. And you are going to be in an awful lot of trouble with the District Attorney's office if we don't get this matter straightened up." These statements, voiced by the probate judge early in the contempt hearing, indicate that she prejudged Robinson's guilt before considering evidence presented by both sides. *See Murray*, 383 N.W.2d at 907.

The transcript of the May 25 hearing also indicates that, in addition to having prejudged the case, the probate judge became personally involved in the dispute, telling Robinson twice to "shut up" and stating:

> I have been working on this estate for two years ... [and][w]e are going to get this money back.... I don't care whether you have to call everybody that you gave money to.... [U]ntil you free yourself from contempt, you are going to spend every night in jail until I get that money back.

The record of the June 29 hearing also indicates that the probate judge had become personally embroiled in the controversy. For example, the probate judge stated to Robinson's new attorney that "I have advised [Robinson] before that if I had stolen a hundred and two thousand dollars and had given it to friends or family or spent it ... I would make some effort to demonstrate ... that I was trying to get some of that money back," and "I think she could easily get her hands on this money and that she has not. She has chosen not to do it out of spite toward her brother, and that is the basis of the Court order of contempt."

Substitution is proper in this case not only on the grounds that the probate judge appeared personally involved in the controversy and had prejudged the case, but also because the judge referred the case to the district attorney for potential criminal prosecution. As a result of this action, the judge may become a witness in any criminal prosecution undertaken by the district attorney, raising concerns over a potential conflict of interest.

Because the record in this case has raised an appearance of possible bias and prejudgment on the part of the probate judge, we hold that another judge be substituted to conduct contempt proceedings on remand.

## IV. Conclusion

It is the duty of a trial court to enforce its own orders; however, in doing so, a trial court must follow procedures established by statute and rule. The failure to do so is an abuse of discretion. Accordingly, we hold that the probate court abused its discretion when it ordered Petitioner to be incarcerated indefinitely in a remedial contempt proceeding without complying with C.R.C.P. 107. In particular, we find that the probate court's finding that Robinson possessed the present ability to purge herself of contempt to be clearly erroneous and not supported by the record. We direct the probate court judge to disqualify herself to allow for the substitution of another judge to adjudicate contempt proceedings in accordance with this opinion.

Justice SCOTT does not participate.

---

outset of a contempt hearing that the defendant was "going to be in a state of confinement in about 10 minutes" and made other remarks evi-

dencing a predisposition to find the defendant in contempt).