21CA1541 Peo v Ewing 04-10-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1541
Arapahoe County District Court No. 02CR1623
Honorable Darren L. Vahle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Alex Christopher Ewing,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE HARRIS
Grove and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 10, 2025

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jason C. Middleton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Alex Christopher Ewing, appeals the judgment of conviction entered after a jury found him guilty of murdering three members of a family in 1984.  He contends that the trial court committed various errors — allowing prosecutorial misconduct in closing argument, giving the jury a coercive instruction during deliberations, and failing to dismiss charges barred by the statute of limitations — and exhibited actual bias against him at sentencing. We discern no error and therefore affirm.

## I.    Background

¶ 2    On January 16, 1984, police responded to the family's home in Aurora after receiving a 911 call from a relative.  Inside the home, police discovered the bodies of two adults and their seven-year-old daughter, all bludgeoned to death with a claw hammer.  A three-year-old child was found in bed, alive but severely injured.

¶ 3    The police determined that the assailant had entered through an open garage door and attacked the family as they slept.  The parents were killed first, and then the assailant went into the children's room.  The seven-year-old was found on the bedroom floor with a blanket over her face, the bottom of her pajamas cut off

1

and her legs spread open.  She had been raped before being beaten to death.

¶ 4     The police collected the blanket and a piece of the carpet from underneath her body.  They suspected that the assailant's semen was on those items, but DNA profiling technology was not available at the time.  The investigation eventually went cold.

¶ 5     By the early 2000s, though, DNA science had evolved sufficiently to allow analysts at the Colorado Bureau of Investigation to develop a DNA profile from the biological material recovered from the blanket and the carpet piece.  Police entered the profile into the national DNA database.

¶ 6     About ten years later, investigators learned that the DNA from the Aurora murder scene matched DNA recovered from another crime scene in Colorado.

¶ 7     Six days before the Aurora murders, an assailant entered a home in Lakewood through an open garage.  He raped the female occupant then bludgeoned her to death with a hammer.  When police found the woman, she was on the floor with a blanket covering her face and her legs spread open.  Analysts developed a DNA profile from semen found on the Lakewood victim's carpet.

That profile was also entered into the national database, which yielded a "hit" to the DNA profile connected to the Aurora murders. The identity of the assailant, however, was still unknown.

¶ 8     In 2018, investigators discovered that the DNA samples in the database matched a sample taken from Ewing, who was then serving a sentence in Nevada. Prosecutors in the Aurora case charged Ewing with three counts of first degree murder (after deliberation), three counts of first degree felony murder, and multiple other felonies including burglary and sexual assault.[1] All charges except the six murder counts were later dismissed as barred by the statute of limitations.

¶ 9     At trial, the contested issue was identity. The prosecution relied almost exclusively on the DNA evidence and the similarities between the Aurora and Lakewood murders to prove that Ewing committed the charged crimes. Ewing countered that investigators and analysts contaminated evidence, failed to test other evidence, and refused to consider alternative theories.

---

[1] Prosecutors separately charged Ewing with murder in the Lakewood case. Evidence of the Lakewood murder was admitted at trial under CRE 404(b) to prove identity and modus operandi.

¶ 10   The jury returned guilty verdicts on all the murder counts.  At sentencing, the court vacated the three multiplicitous felony murder convictions and imposed consecutive sentences of life in prison on the three first degree murder (after deliberation) convictions.

## II.   Prosecutorial Misconduct

¶ 11   Ewing contends that the prosecutor committed misconduct during closing argument by shifting the burden of proof, commenting on his right to remain silent, and misstating the law.

### A.   The Closing Arguments

¶ 12   During his closing argument, defense counsel told the jury that he was "worried that you all might be back there thinking, 'Well, they never gave us an innocent explanation for the semen [on the blanket or carpet piece]; they never explained that to us.'" Counsel reminded the jury that because it was the prosecution's burden to prove Ewing's guilt beyond a reasonable doubt, the defense "do[es] not, ever, have to do that" — by which he meant, presumably, that Ewing did not have to offer any explanation as to why his semen was present on the blanket and carpet piece found on or near the seven-year-old victim.

4

¶ 13    In response, the prosecutor opened his rebuttal closing argument by asserting that "[t]here is no innocent explanation. There is absolutely no innocent explanation about how that man's sperm got underneath [the child's] raped body" or on the blanket. He insisted that there was also "no innocent explanation about how [Ewing's] sperm got inside [the Lakewood victim], underneath her, or on the blanket that covered her." He told the jury, "You have heard no innocent explanation because one does not exist." At the end of his argument, he returned to that theme: "At the end of the day, the defense needs you to believe that there is some innocent explanation for how that man's sperm got on all of this evidence, and the fact of the matter is there isn't [one]."

## B.    Discussion

¶ 14    Ewing says that the prosecutor's comments shifted the burden of proof and improperly highlighted his decision not to testify by suggesting that he "was guilty because he and his defense attorneys never provided the jury with an innocent explanation." And he contends that the prosecutor misstated the law because the jury did not "need to believe" there was an innocent explanation for the presence of his DNA in order to find him not guilty.

¶ 15     A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts. *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010). But during closing argument, a prosecutor may not attempt to shift the burden of proof to the defendant, *see People v. Santana*, 255 P.3d 1126, 1130 (Colo. 2011), or comment on the defendant's failure to testify, *see Howard-Walker v. People*, 2019 CO 69, ¶ 44. Nor may the prosecutor misstate the law. *See People v. Sanders*, 2022 COA 47, ¶ 54, *aff'd on other grounds*, 2024 CO 33.

¶ 16     We see nothing wrong with the prosecutor's argument. The comments did not shift the burden of proof or direct the jury to Ewing's decision not to testify. The prosecutor did not say that Ewing had the burden of proof, *see Santana*, 255 P.3d at 1131, or refer to his failure to testify, *People v. Todd*, 538 P.2d 433, 436 (Colo. 1975), and the comments were a direct response to defense counsel's argument, *see People v. Walker*, 2022 COA 15, ¶ 41.

¶ 17     The comments supported the prosecution's broader argument that the DNA evidence proved beyond a reasonable doubt that Ewing committed the murders, and that there was no reasonable alternative view of the evidence — i.e., there was no "innocent

6

explanation" for the presence of Ewing's DNA at the crime scenes. In this way, the comments merely highlighted the lack of evidence supporting the defense theory that someone else had murdered the family. *See People v. Liggett,* 114 P.3d 85, 89 (Colo. App. 2005) ("A prosecutor's comment on the lack of evidence confirming a defendant's theory of the case is permissible and does not shift the burden of proof."), *aff'd,* 135 P.3d 725 (Colo. 2006). Ewing was guilty, according to the prosecutor, not because *he* did not offer an explanation but because there was *no* explanation for Ewing's DNA on the blanket and carpet other than that he had committed the sexual assault and murders.

¶ 18    That argument did not amount to a misstatement of the law. The prosecutor's theory was that the DNA evidence alone established guilt beyond a reasonable doubt. Therefore, according to that theory, in order for the jury to have a reasonable doubt, it had to discount the relevance of the DNA evidence for some reason — for example, because there was a plausible alternative explanation for the presence of Ewing's DNA at the scene. We do not disagree with Ewing's proposition that "[i]f the jury has a reasonable doubt about the prosecution's proof . . . then the jury's

7

duty is to acquit — regardless of whether there is an innocent explanation provided." That proposition is circular, though. The prosecution's point was that, without some plausible explanation for the DNA, the jury should not have had a reasonable doubt about the prosecution's proof and therefore should not have acquitted Ewing.

¶ 19    We conclude that the prosecutor did not commit misconduct; thus, the court did not err by overruling defense counsel's objections to the prosecutor's comments.

### III.   Modified-*Allen* Instruction

¶ 20    Ewing contends that the trial court erred by giving a modified-*Allen* instruction[2] after the jury advised that it was deadlocked.

### A.    The Court's Instruction

¶ 21    The trial took ten days. The jury heard from more than thirty witnesses and viewed scores of exhibits.

¶ 22    Jurors began deliberating around noon on the last day of trial. Less than four hours later, the jury sent a note to the court: "We are at a point where we are at an impasse with virtually no

---

[2] *See Allen v. People*, 660 P.2d 896, 898 (Colo. 1983).

possibility of agreement." Defense counsel moved for a mistrial. The court denied the motion and decided instead on the following plan:

> [W]e'll bring the jury in, I will . . . inquire of the foreperson only whether she believes further time would help them come to a unanimous decision. If she says "yes," we will discharge them for the evening and have them come back tomorrow and start again; I won't give them any instruction. If she says "no," I will then ask whether she thinks it would be helpful to break for the evening and start afresh tomorrow. If she says "no" to that, then I will give them the [pattern] modified *Allen* instruction.

¶ 23 The court brought the jury in, and asked the foreperson, "Do you think, if we give you more time to deliberate, that would assist in moving forward to reaching a unanimous verdict?" The foreperson answered, "It's highly unlikely." The court then asked whether "it would be helpful to break for the evening . . . and start again in the morning[.]" The foreperson said that "a break would, of course, be helpful," but she did not "know if anything would change in the morning."

¶ 24 The court then gave the jury the pattern modified-*Allen* instruction, *see* COLJI-Crim. E:18 (2024), and sent them home for

the night with directions to continue deliberating the next day. The next morning, the court re-read the modified-*Allen* instruction to the jury, and deliberations resumed. At noon, the defense filed a written motion for a mistrial, which the court denied. Sometime thereafter, though the record does not indicate exactly when (defense counsel mentioned that the jury had been deliberating for approximately five and a half hours), the jury reported that it had reached unanimous verdicts on all counts. After the verdicts were read, the court polled the jurors, each of whom confirmed their verdicts.

## B. Discussion

¶ 25 Ewing argues that the court erred by denying his motion for a mistrial and instead giving the jury a modified-*Allen* instruction, which he says was "coercive and impaired unanimity."

¶ 26 When the jury reports that it has reached an impasse in deliberations, the trial court should take certain steps to avoid coercing a verdict. As an initial matter, it must determine that the jury is actually deadlocked. *See People v. Cox*, 2023 COA 1, ¶¶ 11, 20 (jury's question, "What happens if the jury fails to reach a unanimous decision?", did not indicate that the jury was

deadlocked). If the jury's note does not indicate a true deadlock, the court can simply instruct the jury to continue deliberations. *See id.* at ¶¶ 12, 18, 22 (when jury asked about a hypothetical deadlock, court did not err by instructing the jury, "[p]lease continue your deliberations"). But if the jury's note shows a true impasse, the court may not give any supplemental instruction without first inquiring as to the likelihood that continued deliberations will result in a unanimous verdict. *See People v. Black*, 2020 COA 136, ¶ 19. If progress is likely, the trial court can give the same unqualified instruction to continue deliberations. *Id.* at ¶ 20. If the trial court determines that progress is unlikely, the court may give a modified-*Allen* instruction. *Id.* at ¶ 21.

¶ 27     "A modified-*Allen* instruction is a supplemental jury instruction designed to encourage, but not coerce, a deadlocked jury into reaching a unanimous verdict." *Fain v. People*, 2014 CO 69, ¶ 2.[3] "Although the fact that the jury is at something of an

---

[3] A modified-*Allen* instruction tells the jury "that it should attempt to reach a unanimous verdict; that each juror should decide the case for [themself]; that the jurors should not hesitate to reconsider their view; and that they should not surrender their honest convictions solely because of others' opinions or to return a verdict." *Gibbons v. People*, 2014 CO 67, ¶ 1.

11

impasse increases the coercive risk of *any* instruction to continue deliberating, the modified-*Allen* instruction's prophylactic exhortations mitigate this risk." *Black*, ¶ 21.  Still, a modified-*Allen* instruction is "not always uncoercive." *Id.* at ¶ 22.  "So, if progress towards a verdict is not just unlikely but is impossible, even a modified-*Allen* instruction may be impermissibly coercive." *Id.* Whether an instruction is coercive "will necessarily depend on the content of the instruction and the context in which it is given." *Gibbons v. People*, 2014 CO 67, ¶ 30.

¶ 28     "[A]ddressing the fluid dynamics associated with possible deadlock is a quintessential [trial] court responsibility"; thus, trial courts have broad discretion in this area.  *Cox*, ¶ 16 (quoting *Gibbons*, ¶ 31).  We therefore review the trial court's decision to give a modified-*Allen* instruction for an abuse of discretion.  *Gibbons*, ¶ 12.  A court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or contrary to law.  *People v. Espinosa*, 2020 COA 63, ¶ 8.

¶ 29     We discern no abuse of the trial court's discretion.

¶ 30     First, the jury's note came less than four hours into deliberations, after a ten-day murder trial in which jurors heard

gruesome and wrenching testimony.  *See Fain,* ¶ 21 (affirming the trial court's decision to give a modified-*Allen* instruction where the jury "had been discussing the case for only half a day"); *cf. Cox,* ¶ 21 (affirming the trial court's decision to give an unqualified instruction to continue deliberations where the jury had been deliberating for four and a half hours after a four-day murder trial).

¶ 31    Second, the court reasonably concluded that the jury was not "hopelessly deadlocked," which reduced the potential for a coerced verdict.  *See Fain,* ¶ 19.  The court observed instead that the jurors "look[ed] tired and frustrated" when they reported the impasse and seemed receptive to taking an evening break and resuming deliberations the next day.  *See Cox,* ¶ 21 (court properly instructed the jury to continue deliberations because the initial impasse likely reflected "some frustration over being unable to reach a unanimous verdict immediately").

¶ 32    Third, the content of the instruction was not coercive.  The court did not place a deadline on deliberations or use "the specter of a mistrial to threaten jurors into returning a verdict."  *Gibbons,* ¶ 30.  The instruction did not tell the jury that it had to reach a unanimous verdict.  *Cf. Jenkins v. United States,* 380 U.S. 445, 446

13

(1965) (trial court's exhortation to jury that "[y]ou have got to reach a decision in this case" was coercive). And after receiving the instruction, the jury continued to deliberate for at least another five and a half hours. *See, e.g.*, *Gilbert v. Mullin*, 302 F.3d 1166, 1173 (10th Cir. 2002) (in determining whether a supplemental instruction was coercive, courts should consider, among other factors, "the length of the jury's subsequent deliberations") (citation omitted).

¶ 33 Focusing on the court's proposed plan for responding to the jury's note, Ewing contends that "[n]o matter what the jury said . . . the trial court was going to have the jury return for further deliberations." But as we have noted, what the foreperson said was that, even if she could not be sure anything would change, "a break would, of course, be helpful." Under the circumstances, we cannot conclude that the court abused its discretion by ordering an evening break and giving a non-coercive instruction to continue deliberating.

## IV. Felony Murder Counts

¶ 34 To prove felony murder, the prosecution must show, as relevant here, that during the defendant's commission of an

14

enumerated felony, a person died. *See* § 18-3-102(1)(b), C.R.S. 1984. Ewing was charged with three felony murder counts, one for each victim, based on his commission of first degree burglary or sexual assault. Before trial, he moved to dismiss the felony murder counts on the ground that the statute of limitations for burglary and sexual assault had expired. The court denied his motion.

¶ 35    On appeal, Ewing reiterates his statute of limitations argument. Relying on *Doubleday v. People*, 2016 CO 3, he contends that "the impossibility of obtaining a conviction on the underlying offense is a bar to conviction of felony murder." We think Ewing's reliance on *Doubleday* is entirely misplaced, but we need not reach the merits of his argument because, as he acknowledges, his felony murder convictions were vacated as multiplicitous.

¶ 36    That leaves Ewing with a vague and undeveloped argument that the mere submission of the felony murder counts to the jury prejudiced him. He says the court's purported error "inflated the number of [charges] against" him and required the jury to "decide the issue of guilt regarding those other offenses." But because Ewing does not dispute that the jury would have heard all the same evidence regardless of whether the felony murder counts were

15

dismissed, we do not see how he was prejudiced. The jurors had to determine whether he had committed murder by bashing three people's heads with a hammer, one of whom was a child. And they had to determine whether, before he bashed the child's head in, he raped her and left his semen on a blanket, which later established that he was the murderer. We are hard pressed to see any additional prejudice because the jury also considered whether he committed burglary.

¶ 37 Accordingly, even without deciding whether the felony murder charges were barred by the statute of limitations, we conclude that Ewing's claim fails.

## V.    Judicial Bias at Sentencing

¶ 38 Lastly, Ewing argues that the judge's comments at sentencing demonstrated that he was biased and had prejudged Ewing's guilt.

### A.    The Court's Comments

¶ 39 Before imposing sentence, the trial judge addressed Ewing, telling him that "nothing [the judge] ha[d] seen" in the twenty-five years he had been a lawyer "compare[d] with the level of depravity" that Ewing's actions "show[ed] in this case." The judge called Ewing "an abomination" and said that "every breath [Ewing had] drawn

since 1984 is a crime against everything that is good and decent and right in the world." Then the judge described the inadequacy of any punishment:

> There is no punishment — I thought about this during the trial. I thought is there a punishment that I can conceive of that is too harsh for you. And I can't come up with one. If we had the death penalty, that would be right and just and fair for you to forfeit your life for what you did. We do not have a death penalty available in this case, and so because of that, the most that I can do, and I think that which it is my duty to do, is everything in my power to make sure that you never draw a free breath again.

## B. Discussion

¶ 40    Ewing says that judge's comments evinced "animosity and bias" toward him, and that the statement, "I thought about this during the trial" shows that the judge prejudged Ewing's guilt during the trial.

¶ 41    "Basic to our system of justice is the principle that a judge must be free of all taint of bias and partiality." *People v. Jennings*, 2021 COA 112, ¶ 18. Thus, a judge may not preside over a case if he has "a personal bias or prejudice concerning a party," *People in Interest of A.G.*, 262 P.3d 646, 650-51 (Colo. 2011) (citation

17

omitted), or if he has prejudged the defendant's guilt, *see In re Estate of Elliott*, 993 P.2d 474, 481-82 (Colo. 2000).

¶ 42    However, under what is sometimes referred to as the "extrajudicial source doctrine," to be disqualifying, the judge's alleged bias must stem from "a source outside the judicial proceeding at hand." *Liteky v. United States*, 510 U.S. 540, 545 (1994). In other words, "knowledge (and the resulting attitudes) that a judge properly acquire[s]" during the proceedings are not "extrajudicial" and do not require recusal. *Id.*; *see also People v. Dobler*, 2015 COA 25, ¶ 26 (judicial statements that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless the court's opinion comes from an extrajudicial source).

¶ 43    As an initial matter, to the extent Ewing asserts that he is entitled to reversal of his convictions based on an alleged appearance of bias, we reject that assertion. "[W]hile both an appearance of impropriety and actual bias are grounds for *recusal* from a case, only when the judge was actually biased will [a reviewing court] question the *result.*" *People v. Garcia*, 2024 CO 41M, ¶ 21 (quoting *Sanders v. People*, 2024 CO 33, ¶ 50).

18

¶ 44    Thus, we turn to Ewing's argument that the trial judge's comments at sentencing revealed actual bias requiring his disqualification.  We review that claim de novo and, if we determine that the judge was actually biased, structural error applies.  *Id.* at ¶¶ 20-21.

¶ 45    We conclude that disqualification was not required because the comments, though harsh, reflected opinions the judge had formed based on the evidence presented during the proceedings. *See, e.g., State v. Schaeffer*, 286 P.3d 889, 891-93 (Kan. 2012) (judge's comments at sentencing, including that he had "thought a lot about this case," "this [was] one of the most heinous crimes" he had ever seen, the defendant should "not be allowed to live" or "survive," and "if [he] could do more [than a life sentence, he] would," did not amount to actual bias); *United States v. Collier*, 932 F.3d 1067, 1078-79 (8th Cir. 2019) (judge's comments at sentencing, including calling the defendant's case "stupid" and expressing frustration, did not amount to judicial bias); *State v. Rizzo*, 31 A.3d 1094, 1130-33 (Conn. 2011) (judge's comments that the defendant was a part of the "murderers' hall of fame" and that murderers were "not human" did not show actual bias), *superseded*

*by statute on other grounds as stated in State v. Santiago*, 122 A.3d 1 (Conn. 2015); *see also Liteky*, 510 U.S. at 550-51 ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.").

¶ 46 Nor can we say that the judge's comments showed prejudgment of the case. The fact that the trial judge, at some unknown point during the trial, had "thought about" the appropriate punishment for Ewing does not establish that the judge had predetermined Ewing's guilt. The court could properly have considered that, *if the jury found Ewing guilty*, he would have to impose some penalty that fit the crime.

¶ 47 The cases Ewing cites in support of his argument are easily distinguished. In each of those cases, the court made an unequivocal statement concerning the defendant's guilt or a witness's credibility before hearing any evidence in the case. In *People v. Botham*, for example, the judge, in a conversation with the state public defender about the defendant, who was the only suspect in a murder investigation, suggested that the police "put the guy in jail, choke a confession out of him and charge him with

20

the first degree murders." 629 P.2d 589, 594 (Colo. 1981), *superseded by rule on other grounds as stated in People v. Garner,* 806 P.2d 366, 370 (Colo. 1991). In *Estate of Elliott,* the judge, at the outset of a contempt proceeding, told the contemnor, "[I]t's my belief that you may have stolen property from th[e] estate, and we are going to recover the property," and then warned the contemnor that she was "in an awful lot of trouble" with the court, and would be "in an awful lot of trouble with the District Attorney's office" if she did not cooperate. 993 P.2d at 476; *see also Estep v. Hardeman,* 705 P.2d 523, 525 (Colo. 1985) (on interlocutory appeal of denial of a disqualification motion, supreme court ordered the judge to recuse from future proceedings after he disparaged a defense witness's credibility to defense counsel before any hearing had occurred).

¶ 48    Here, the judge did not make any pretrial statement about Ewing's credibility or his guilt. For that reason, we find *Smith v. District Court,* 629 P.2d 1055 (Colo. 1981), more instructive. In that case, as the defendant was leaving the courtroom, he made a threat against the judge, which was overheard by a deputy sheriff who then conveyed the information to the judge. *Id.* at 1056. The judge

21

told defense counsel about the threat and commented, "I think he would do it." *Id.* Counsel argued that the judge should have recused from the sentencing hearing because his comment revealed his belief that the defendant was dangerous, which showed actual bias. *Id.* The supreme court disagreed, reasoning that the judge could properly form an opinion about the defendant's dangerousness based on conduct that occurred during the court proceedings. *Id.* at 1057.

¶ 49 In sum, we conclude that Ewing has failed to demonstrate that the trial judge harbored actual bias or predetermined his guilt. Accordingly, disqualification was not required.

## VI. Cumulative Error

¶ 50 Because we have rejected each of Ewing's contentions of error, we likewise reject his cumulative error argument. *See People v. Daley*, 2021 COA 85, ¶ 141 (cumulative error analysis applies when "numerous errors occurred").

## VII. Disposition

¶ 51 The judgment is affirmed.

JUDGE GROVE and JUDGE PAWAR concur.

22