507 P.3d 1078
2022 COA 3
IN RE the Parental Responsibilities Concerning A.C.B., a Child,
and
Concerning Laura Jeane Frederick, Petitioner,
and
Joshua Broyhill, Appellant,
and
Concerning Pueblo County Child Support Services, Intervenor-Appellee.
Court of Appeals No. 19CA2029
Colorado Court of Appeals, Division I.
Announced January 6, 2022
Robinson Waters & O'Dorisio, P.C., Tracy L. Ashmore, Denver, Colorado, for Appellant
Willoughby & Associates, Kimberly R. Willoughby, Golden, Colorado, for Amicus Curiae American Academy of Matrimonial Lawyers
Cynthia Mitchell, County Attorney, Maclovio F. Gallegos, Assistant County Attorney, Pueblo, Colorado, for Intervenor-Appellee
Polidori, Franklin, Monahan, & Beattie, LLC, Robin Lutz Beattie, Lakewood, Colorado, for Amicus Curiae Family Law Section of the Colorado Bar Association
Mark Silverstein, Anna I. Kurtz, Denver, Colorado, for Amicus Curiae American Civil Liberties Union of Colorado
Opinion by JUDGE WELLING
¶ 1 In this contempt proceeding initiated by Pueblo County Child Support Services (CSS) against Joshua Broyhill, Broyhill appeals the trial court's judgment finding him in indirect contempt for failure to comply with a child support order and imposing a jail sentence as a remedial sanction. He argues primarily that the trial court violated his right to due process by failing to appoint counsel to assist him in his defense of the contempt citation.
¶ 2 Throughout the contempt proceedings, Broyhill repeatedly told the court that he was indigent and insisted, based on his indigency and the fact that CSS was pursuing imprisonment as a remedial sanction, that he was entitled to court-appointed counsel at state expense. The trial court denied the request on the grounds that the right to court-appointed counsel doesn't extend to contempt proceedings where only remedial sanctions — not punitive sanctions — are requested. ¶ 3 We conclude that when, as here, a contempt proceeding is initiated by a governmental entity and where a jail sentence is an available remedial sanction, an alleged contemnor who is indigent has the right to court-appointed counsel. We further conclude that the trial court violated Broyhill's due process rights when it refused to inquire into his indigency status to determine whether he qualified for court-appointed counsel. As a result, we reverse the judgment and sentence and remand the case for the trial court to determine if Broyhill is indigent and, if so, to appoint counsel to represent him at a new contempt hearing.
I. Relevant Facts
¶ 4 In 2015, CSS petitioned the trial court to register a 2004 Iowa administrative order requiring Broyhill to pay monthly child support of $183 to Laura Jeane Frederick (mother).[1] The court later registered the foreign support order.
507 P.3d 1082 ¶ 5 In September 2018, CSS, on behalf of mother, filed a motion requesting that the trial court issue an indirect contempt citation to Broyhill, alleging that he had an unpaid child support balance in the amount of $11,929. CSS sought, as a remedial sanction, "a jail sentence for an indefinite period of time, not to exceed six months, suspended on the condition that [Broyhill] pays [his] monthly child support obligation for a set period of time plus an additional payment amount toward the arrearage balance."[2] The court issued the contempt citation, which advised Broyhill that CSS was seeking "remedial contempt" and that he had the right "[t]o be represented by an attorney at [his] own expense ." (Emphasis added.)
¶ 6 After being served with the contempt citation, Broyhill appeared before the trial court to be advised of his rights. During the advisement, the court informed him that he had "the right to be represented by a lawyer of [his] own choosing should [he] wish to hire one." He said that he couldn't afford an attorney.
¶ 7 Throughout five subsequent status conferences held over the course of four months, Broyhill continued to represent to the trial court that he was indigent, telling the court, among other things, that he can't "afford a lawyer" and he has "very little money and [he] need[s] to find a pro bono attorney."
¶ 8 During the fourth status conference, Broyhill made the following request for court-appointed counsel:
[Broyhill]: Well the fact of the matter is ... I honestly believe that I am entitled to a court[-] appointed attorney....
The reason I say I believe I'm entitled to a court[-]appointed attorney is because according to the Colorado Court of Appeals and a decision of Padilla versus Padilla in 1982, they had decided and I quote, where a jail sentence maybe imposed in a contempt proceeding the alleged conte[mnor,] if indigent[,] is entitled to the appointment of [c]ounsel.
So it is my understanding that I'm entitled to the appointment of [c]ounsel considering I am indigent and I would like to be provided the ability to prove my indigence and to be provided the court[-]appointed [c]ounsel as directed by the [s]upreme [c]ourt ... and also by several Chief Justice Directives provided by that [s]upreme [c]ourt[,] Ma'am.
THE COURT: Okay. Counsel I assume this is remedial and not --
[CSS]: It is. It's remedial.
THE COURT: Yeah okay. All right. Sir that's not my understanding of the law. This is a remedial contempt not a punitive contempt.
¶ 9 In August 2019, Broyhill proceeded to the contempt hearing without counsel. CSS, on the other hand, appeared and participated in the hearing through counsel. Testifying in narrative form, as well as responding to the trial court's questions, Broyhill insisted that he lacked the past and present ability to comply with the child support order. More specifically, he testified that various disabilities prevented him from obtaining or maintaining meaningful employment. But he neither offered exhibits nor called any other witnesses on his own behalf.
¶ 10 At the end of the hearing, Broyhill repeated his request for court-appointed counsel, saying: "I honestly believe that the [c]ourt should appoint me a lawyer based on the case law that I've read." The court again denied the request. It then found him in indirect contempt primarily on the basis that he failed to introduce any documentation of any disability.
¶ 11 As a remedial sanction, the trial court sentenced Broyhill to thirty days in jail, but it stayed the sentence on the condition that he remain current with his child support obligation. The court didn't make explicit findings with respect to his ability to make either past or present child support payments.
¶ 12 With the assistance of pro bono counsel, Broyhill appealed and filed an opening brief. CSS didn't file an answer brief.
¶ 13 We then invited supplemental briefing from CSS and potentially interested amicus 507 P.3d 1083 curiae, including the Family Law Section of the Colorado Bar Association (CBA), the Colorado Chapter of the American Academy of Matrimonial Lawyers (AAML), the Colorado Division of Child Support Services, the Office of the Child's Representative, and Colorado Counties, Inc. The Colorado Chapter of the AAML, the Family Law Section of the CBA, and the American Civil Liberties Union of Colorado filed amicus briefs, all in support of Broyhill's position. Although CSS had numerous opportunities to file an answer brief, respond to the amici, or otherwise inform us of and argue its position, it never did.
II. Discussion
¶ 14 Broyhill contends that the trial court denied him due process of law under the Fourteenth Amendment to the United States Constitution by failing to determine whether he was indigent and, thus, entitled to court-appointed, state-paid counsel. We agree.
A. Standard of Review ¶ 15 The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects citizens from the deprivation of liberty without due process. U.S. Const. amend. XIV, § 1 ; see M.S. v. People , 2013 CO 35, ¶ 9, 303 P.3d 102. This clause confers both procedural and substantive due process rights. M.S. , ¶ 9. ¶ 16 Because this case presents an issue of procedural due process, we review de novo. See People in Interest of K.N.B.E. , 2019 COA 157, ¶ 11, 457 P.3d 140 ; Copley v. Robinson , 224 P.3d 431, 435 (Colo. App. 2009) (procedural due process requires that fundamentally fair procedures are in place when the state threatens a protected liberty interest).
B. C.R.C.P. 107 ¶ 17 Contempt proceedings are governed by rule, specifically C.R.C.P. 107. The version of the rule in effect until 1995 recognized two types of contempt: criminal and civil. People v. Razatos , 699 P.2d 970, 974 n.1 (Colo. 1985). Generally, criminal contempt and civil contempt were differentiated by the purpose of the proceeding and type of sanctions requested. See id. at 974.
¶ 18 Criminal contempt was punitive in nature and carried an unavoidable, determinative sanction, crafted to punish the contemnor and vindicate the court's dignity. Id. ; In re Pechnick , 128 Colo. 177, 182, 261 P.2d 504, 507 (1953).
¶ 19 Civil contempt, on the other hand, was remedial in nature and carried a sanction tailored to coerce compliance with the court's order and which could be purged by the contemnor taking an action that was within his power and ability to perform. Razatos , 699 P.2d at 974 ; Pechnick , 128 Colo. at 182, 261 P.2d at 507 ("Civil contempt proceedings are to preserve and enforce the rights of private parties to litigation and to compel obedience to the orders made for the benefit of litigants.").
¶ 20 Criminal contempt was often referred to as punitive contempt, and civil contempt was referred to as remedial contempt. See Razatos , 699 P.2d at 974 ; see also In re Marriage of Zebedee , 778 P.2d 694, 698 (Colo. App. 1988). ¶ 21 In 1995, C.R.C.P. 107 was rewritten. 5 Sheila K. Hyatt & Stephen A. Hess, Colorado Practice Series , Civil Rules Annotated Rule 107 author cmt. 107.1, Westlaw (5th ed. database updated Oct. 2021); see In re Marriage of Cyr , 186 P.3d 88, 92-93 (Colo. App. 2008). Under the post-1995 rule, there are two types of contempt — direct and indirect — and two types of sanctions — remedial and punitive. See People ex rel. State Eng'r v. Sease , 2018 CO 91, ¶ 21, 429 P.3d 1205 ; In re Estate of Elliott , 993 P.2d 474, 478 (Colo. 2000) ; see also C.R.C.P. 107(a)(2)-(5). ¶ 22 The fundamental distinction between direct contempt and indirect contempt lies in the location of the contumacious act. Direct contempt takes place in the court's presence before a judge who has personal knowledge of the act, while indirect contempt doesn't. C.R.C.P. 107(a)(2)-(3) ; Sease , ¶ 22. ¶ 23 Punitive sanctions remain criminal in nature because they're intended 507 P.3d 1084 to punish. See C.R.C.P. 107(a)(4) (defining "Punitive Sanctions for Contempt" as "[p]unishment by unconditional fine, fixed sentence of imprisonment, or both, for conduct that is found to be offensive to the authority and dignity of the court"); see also Sease , ¶ 22 ; Cyr , 186 P.3d at 91.
Punitive sanctions must be supported by findings of fact that establish beyond a reasonable doubt that: (1) a lawful order existed; (2) the contemnor had knowledge of the order; (3) the contemnor had the ability to comply with the order; and (4) the contemnor willfully refused to comply with the order. Sease , ¶ 23 (citing In re Marriage of Nussbeck , 974 P.2d 493, 497 (Colo. 1999) ). ¶ 24 Remedial sanctions continue to be civil in nature as they're "imposed to force compliance with a lawful order or to compel performance of an act within the person's power or present ability to perform." C.R.C.P. 107(a)(5). Remedial sanctions must be supported by findings of fact establishing that the contemnor (1) failed to comply with a lawful court order; (2) knew of the order; and (3) has the present ability to comply with the order. In re Marriage of Dean , 2017 COA 51, ¶ 7, 413 P.3d 246. The burden of proving a present inability to comply with the order rests with the alleged contemnor. See Cyr , 186 P.3d at 92. If the trial court finds that the contemnor has the present ability to comply — and thereby purge the contempt — it may impose an indefinite term of imprisonment until the contemnor performs the acts necessary to purge the contempt. See C.R.C.P. 107(d)(2) ; see also Elliott , 993 P.2d at 479. Thus, a remedial sanction of imprisonment is always conditional. That is, by virtue of the finding that the contemnor has the present ability to comply with the court's order and, thereby, purge the contempt, the contemnor holds in his hand the proverbial keys to the jailhouse door — once he purges the contempt, he is free. See Hicks v. Feiock , 485 U.S. 624, 633, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988).
¶ 25 Here, the trial court found Broyhill in indirect contempt for failing to comply with its child support order, and the court purported to impose a remedial sanction. Specifically, it sentenced him to thirty days in jail but suspended that sentence so that he could purge the contempt by staying current with his child support obligation.[3] See C.R.C.P. 107(d)(2), (e) (Though punitive sanctions can be reconsidered, they cannot be suspended "based upon the performance or non-performance of any future acts."); see also In re Marriage of Weis , 232 P.3d 789, 797 (Colo. 2010) ("Because [the contemnor] may be able to purge the contempt, the sanction is in the nature of a remedial contempt sanction.").
¶ 26 We now turn to Broyhill's claim that he was denied the right to request court-appointed and state-paid counsel based on indigency.
C. The Basis for the Right to Counsel in Contempt Proceedings
¶ 27 The United States Supreme Court in Gideon v. Wainwright , 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), unanimously held that the Sixth Amendment to the United States Constitution, which is applied to the states through the Due Process Clause of the Fourteenth Amendment, requires the appointment of counsel at public expense to indigent defendants in state felony trials. See also Stern v. Cnty. Ct. , 773 P.2d 1074, 1076 (Colo. 1989). The danger of the state erroneously taking a person's physical liberty led the Court to declare it an "obvious truth" that an indigent person can't be assured a fair trial against the judicial "machinery" unless counsel is provided at no cost. Gideon , 372 U.S. at 344, 83 S.Ct. 792.
¶ 28 Later, in Argersinger v. Hamlin , 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), the Supreme Court extended the scope of that right to state misdemeanor cases resulting in imprisonment. See also Stern , 773 P.2d at 1076.
¶ 29 In People v. Lucero , 196 Colo. 276, 284, 584 P.2d 1208, 1214 (1978), our supreme court followed the reasoning of Argersinger when confronted with the issue of the right to appointed counsel in a direct contempt 507 P.3d 1085 proceeding involving the possibility of imprisonment. There, a recalcitrant witness, despite being granted transactional immunity, persisted in refusing on Fifth Amendment grounds to testify before a grand jury. See id. at 278-79, 584 P.2d at 1210. The judge found the witness in direct contempt and summarily ordered him imprisoned until he agreed to testify or until the grand jury term expired. Id. at 279, 584 P.2d at 1210.
¶ 30 Though the supreme court in Lucero affirmed the contempt finding and sanction, it noted that the judge's refusal to permit legal assistance at certain times during several contempt proceedings was "troublesome." Id. at 283, 584 P.2d at 1214. Citing Argersinger and several federal circuit court opinions, the court said "that the right to counsel must be extended to all contempt proceedings, whether labeled civil or criminal, which result in the imprisonment of the witness." Id. at 284, 584 P.2d at 1214 ("Labeling the contempt civil and conditioning the incarceration on a continued refusal to testify does not alter the burden of imprisonment."). But see Gagnon v. Scarpelli , 411 U.S. 778, 781, 788, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (refusing to extend Gideon and Argersinger to establish a per se rule for appointment of counsel in all civil proceedings where the possibility of imprisonment exists); In re Calhoun , 47 Ohio St.2d 15, 350 N.E.2d 665, 666 (Ohio 1976) (Sixth Amendment right to counsel as set forth in Argersinger is inapplicable to civil contempt because that right is limited to criminal proceedings).
¶ 31 The supreme court then articulated the principle that the Sixth Amendment secures to indigent people the right to appointed counsel in every contempt proceeding where imprisonment is a real threat. See Lucero , 196 Colo. at 284, 584 P.2d at 1214 ; see also Razatos , 699 P.2d at 977 ("[T]he possibility of imprisonment arising out of contempt proceedings, whether civil or criminal, has been held to trigger the Sixth Amendment right[ ] to counsel."); see also In re Bauer , 30 P.3d 185, 188 (Colo. 2001) (noting that the Sixth Amendment right to counsel afforded to criminal defendants extends to contempt proceedings, both civil and criminal, which may result in imprisonment of the contemnor).
¶ 32 And the same reasoning has been employed in other cases before this court. See In re Marriage of Dion , 970 P.2d 968, 971 (Colo. App. 1997) ; see also In re Marriage of Barber , 811 P.2d 451, 456 (Colo. App. 1991) ("If a jail sentence may be imposed in a contempt proceeding, the alleged contemnor, if indigent, is entitled to the appointment of counsel."); Griffin v. Jackson , 759 P.2d 839, 843 (Colo. App. 1988) ("The Sixth Amendment right to counsel afforded criminal defendants must be extended to contempt proceedings, both civil and criminal, which result in imprisonment of the contemn[o]r."); In re Marriage of Wyatt , 728 P.2d 734, 735 (Colo. App. 1986) ; Padilla v. Padilla , 645 P.2d 1327, 1328 (Colo. App. 1982) ("[A]ny legal proceeding, in which an individual may be imprisoned ... should be treated as a criminal prosecution as contemplated by the [S]ixth [A]mendment." (quoting Lobb v. Hodges , 641 P.2d 310, 311 (Colo. App. 1982) )).
¶ 33 However, a fairly recent United States Supreme Court case, Turner v. Rogers , 564 U.S. 431, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011), changed the legal landscape. That is where we turn next.
D. Turner v. Rogers
¶ 34 In Turner , the mother moved for civil contempt against the father for nonpayment of child support. Id. at 436-37, 131 S.Ct. 2507. Neither side was represented by counsel. Id. at 437, 131 S.Ct. 2507. At an abbreviated contempt hearing, the trial court only asked the father, who was on disability and had a history of substance abuse, whether he had anything to say about the contempt charge. Id. In a brief statement, he apologized and asked to be given another chance. Id. The court ultimately found him in contempt and sentenced him to a year in jail until he purged the contempt by paying the full balance owed. Id. The court didn't make an express finding about, or otherwise address, his ability to pay his arrearages. Id. at 437-38, 131 S.Ct. 2507.
¶ 35 When the case reached the Supreme Court, the father maintained that he had a constitutional right to appointed counsel at 507 P.3d 1086 his civil contempt proceeding. Id. at 438, 131 S.Ct. 2507.
¶ 36 At the outset, the Court reaffirmed that the Sixth Amendment right to appointed counsel doesn't apply in civil cases. Id. at 439, 441, 131 S.Ct. 2507. In doing so, Turner effectively superseded the principle our supreme court established in Lucero and its progeny — that an indigent person is guaranteed appointed counsel under the Sixth Amendment in all contempt proceedings, whether punitive or remedial, with the prospect of imprisonment. See Lucero , 196 Colo. at 284, 584 P.2d at 1214.
¶ 37 Next, the Court considered whether the Due Process Clause of the Fourteenth Amendment can be a source for a right to appointed counsel in civil contempt proceedings where imprisonment is an option. Turner , 564 U.S. at 441, 131 S.Ct. 2507.[4] The Court then balanced the factors set forth in Mathews v. Eldridge , 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) :
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
See Turner , 564 U.S. at 444-45, 131 S.Ct. 2507.
¶ 38 The Court found that the interest in losing one's physical liberty through imprisonment argued strongly in favor of the right to appointed counsel. Id. at 445, 131 S.Ct. 2507.
¶ 39 Even so, the Court determined that the combination and weight of the remaining factors balanced against that right. Id. at 446, 131 S.Ct. 2507. In support, the Court identified three considerations.
¶ 40 First, the Court stated that the "critical question" in civil contempt proceedings is the obligor parent's "ability to pay," which is often closely related to the question of indigency. Id. The Court added: "But when the right procedures are in place, indigence can be a question that in many — but not all — cases is sufficiently straightforward to warrant determination prior to providing [that parent] with counsel, even in a criminal case." Id.
¶ 41 Second, the obligee parent was often pro se. Id. The Court feared that providing counsel to the obligor parent would create an "asymmetry of representation" that "would ‘alter significantly the nature of the proceeding.’ " Id. at 447, 131 S.Ct. 2507 (quoting Gagnon , 411 U.S. at 787, 93 S.Ct. 1756 ). And mandating the appointment of counsel would unduly slow down needed child support payments and make the contempt proceeding "less fair overall." Id.
¶ 42 Third, the Court believed that "substitute procedural safeguards" were available that would "reduce the risk of an erroneous deprivation of liberty." Id. (quoting Mathews , 424 U.S. at 335, 96 S.Ct. 893 ). Borrowing from an amicus brief by the United States Solicitor General's Office, the Court suggested the following safeguards:
(1) notice to the [alleged contemnor] that his "ability to pay" is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the [alleged contemnor] to respond to statements and questions about his financial status (e.g. , those triggered by his responses on the form); and (4) an express finding by the court that the [alleged contemnor] has the ability to pay. Id. at 447-48, 131 S.Ct. 2507.
¶ 43 In the end, the Court held that "the Due Process Clause does not automatically 507 P.3d 1087 require the provision of counsel at civil contempt proceedings to an indigent individual who is subject to a child support order, even if that individual faces incarceration (for up to a year)." Id. at 448, 131 S.Ct. 2507.
¶ 44 The Court nevertheless concluded that the father's imprisonment violated the Due Process Clause because he didn't receive the benefit of many of those described procedural safeguards. Id. at 449, 131 S.Ct. 2507. He wasn't clearly notified that his ability to pay would form the critical question in his civil contempt hearing. Id. Nor was he given a fair opportunity to present his financial circumstances. Id. As well, the trial court made no finding that he was even able to pay his child support arrearages. Id.
¶ 45 But the Court specifically declined to address civil contempt proceedings where child support payments are owed to the state. Id. According to the Court, those proceedings resemble debt collection proceedings, and the state is likely to have counsel or some other competent representation. Id.
¶ 46 Our case squarely presents the issue left unresolved in Turner — whether an indigent parent in a state-initiated civil contempt proceeding has a due process right to appointed counsel. Id. In resolving this question, we will conduct our own analysis of the Eldridge factors. See id. at 444-45, 131 S.Ct. 2507 ; see also Eldridge , 424 U.S. at 335, 96 S.Ct. 893.
E. Application of the Eldridge Factors ¶ 47 The first factor, the private interest that will be affected, is Broyhill's physical liberty. See Eldridge , 424 U.S. at 335, 96 S.Ct. 893. "[T]he freedom ‘from bodily restraint,’ lies ‘at the core of the liberty protected by the Due Process Clause.’ " Turner , 564 U.S. at 445, 131 S.Ct. 2507 (quoting Foucha v. Louisiana , 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) ). That interest, therefore, weighs heavily in favor of a right to appointed counsel.
¶ 48 We next examine whether the absence of counsel will increase the risk of an erroneous deprivation of Broyhill's protected liberty interest, and whether he was afforded any additional or substitute safeguards. See Eldridge , 424 U.S. at 335, 96 S.Ct. 893.
¶ 49 Broyhill was pro se while an attorney represented CSS. His lack of counsel created an asymmetry of representation, which the Turner majority understandably feared could make the adversarial contempt proceeding unfair. See 564 U.S. at 447, 131 S.Ct. 2507. As the Court emphasized, "[t]he average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is represented by experienced and learned counsel ." Id. at 449, 131 S.Ct. 2507 (quoting Johnson v. Zerbst , 304 U.S. 458, 462-63, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) ); see also United States v. Bobart Travel Agency, Inc. , 699 F.2d 618, 620 (2d Cir. 1983) (contempt is an area of the law in which counsel's advice is often indispensable). ¶ 50 The need for counsel is particularly acute in cases like this one, where an alleged contemnor's present ability to pay is at issue, as answering that question incorrectly carries with it the very real risk that the alleged contemnor will be wrongfully imprisoned for an indefinite period with no viable means of performing the act necessary to secure his freedom. See C.R.C.P. 107(d)(2) ("If the contempt consists of the failure to perform an act in the power of the person to perform and the court finds the person has the present ability to perform the act so ordered, the person may be fined or imprisoned until its performance."); see also Turner , 564 U.S. at 445, 131 S.Ct. 2507 ("[I]t is obviously important to ensure accurate decisionmaking in respect to the key ‘ability to pay’ question. Moreover, the fact that ability to comply marks a dividing line between civil and criminal contempt reinforces the need for accuracy. That is because an incorrect decision (wrongly classifying the contempt proceeding as civil) can increase the risk of wrongful incarceration by depriving the defendant of the procedural protections (including counsel) that the Constitution would demand in a criminal proceeding.") (citation omitted). ¶ 51 At the hearing, CSS had the initial burden of demonstrating by a preponderance of the evidence, the lowest degree of 507 P.3d 1088 proof, that Broyhill was in indirect contempt for failing to comply with the trial court's child support order. See § 13-25-127(1), C.R.S. 2021 (burden of proof in civil cases is a preponderance of the evidence); see also C.R.C.P. 107(d)(1) (contempt must be proved beyond a reasonable doubt before punitive sanctions may be imposed); C.R.C.P. 107(d)(2) (no provision specifying the burden of proof for remedial sanctions); Cyr , 186 P.3d at 92 (remedial sanctions for contempt under C.R.C.P. 107(d)(2) are civil in nature). Once CSS made a prima facie showing, the burden then shifted to Broyhill to establish a present inability to comply with the order. See C.R.C.P. 107(d)(2) ; see also Cyr , 186 P.3d at 92. He didn't carry that burden. Indeed, he didn't present any evidence about his ability to pay other than his own testimony, which the trial court declined to credit because it was uncorroborated. As the trial court put it, "Broyhill has chosen to litigate this case the way he has chosen to litigate which is to simply call in and say I'm disabled." ¶ 52 A trained advocate would undoubtedly have assisted Broyhill by advising him on the applicable law, raising appropriate objections to CSS's evidence, cross-examining CSS's witnesses, introducing documentary and testimonial proof about his past and present inability to pay (e.g. , employment, financial circumstances, health, disability), or uncovering, perhaps, another viable defense to the charge. Appointed counsel is also essential to guard against general constitutional infirmities or specific due process violations as described in Turner . See 564 U.S. at 447-48, 131 S.Ct. 2507. So, from the preparation of his defense to the last fall of the gavel, Broyhill was clearly disadvantaged. ¶ 53 Yet, the fact that an asymmetry of representation existed isn't dispositive. We must still consider what procedures were in place to offset the lack of symmetry. See id. at 446, 131 S.Ct. 2507. And from our review of the record there doesn't appear to have been any additional or substitute procedural safeguards adopted to reduce the risk of an erroneous deprivation of liberty. For example, there's no indication that Broyhill was provided a form to facilitate the elicitation of relevant and complete financial information. See id. at 447, 131 S.Ct. 2507. And the court's findings about his ability to pay were conclusory, at best.[5] See id. at 448, 131 S.Ct. 2507. In all, appointed counsel would have minimized the risk of the court reaching an erroneous decision with serious consequences. Id. at 445, 131 S.Ct. 2507. ¶ 54 Against the strong private interest in Broyhill's physical liberty and the high risk of erroneous deprivation of that interest, we must still balance the government's interest in not providing the additional safeguards, including the appointment of counsel. See Eldridge , 424 U.S. at 335, 96 S.Ct. 893. ¶ 55 The government in general (and CSS in particular) has an interest in resolving contempt cases in a timely manner. Unlike the worry expressed in Turner (where neither side was represented by counsel), we don't believe that providing counsel would result in delay causing prejudice (as counsel was already participating, albeit just on CSS's side). See 564 U.S. at 447, 131 S.Ct. 2507. In fact, this proceeding was continued several times and eventually resolved approximately one year after the filing of the contempt motion; this was due in large part to accommodating Broyhill's (ultimately futile) efforts to retain pro bono counsel.
507 P.3d 1089 ¶ 56 And while it's true that CSS has a strong interest in ensuring the enforcement of child support orders, CSS also must share with Broyhill an interest in a fair proceeding.
¶ 57 We assume that CSS's interest diverges when it comes to the additional fiscal and administrative burdens associated with the introduction of appointed counsel. See Eldridge , 424 U.S. at 335, 96 S.Ct. 893. This is so because there was no claim by CSS that such burdens would be placed on it. Those rising costs, however, don't weigh heavily when compared with the danger of unjustly depriving a person of her or his liberty.
¶ 58 Under the circumstances of this case, Broyhill's due process rights were violated, as the trial court should've evaluated his claim of indigency and entitlement to court-appointed counsel.[6] Accordingly, we reverse the contempt judgment and sentence and remand the case for a new hearing.[7] ¶ 59 On remand, Broyhill should be afforded the opportunity to prove that he's indigent. And if the trial court is satisfied that he is indigent (and assuming his liberty interest is still at stake), it must provide him with court-appointed counsel at state expense. If, on the other hand, the court finds that Broyhill isn't indigent, it shall make such findings, inform him that he doesn't qualify for court-appointed counsel based on indigency, and afford him an opportunity to retain counsel should he wish to. Only then should the court hold a new contempt hearing.
III. Conclusion
¶ 60 For the reasons set forth above, the contempt judgment and sentence are reversed, and the case is remanded for further proceedings. On remand, the trial court must determine if Broyhill is indigent and, if he is, it must appoint counsel to represent him at a new contempt hearing.
JUDGE DAILEY and JUDGE GROVE concur.
--------
Notes:
[1] This case involves a child support enforcement agency compelling a parent to comply with a child support order pursuant to Title IV-D of the Social Security Act. See §§ 26-13-102, -102.5(1) -(2), C.R.S. 2021; see also 42 U.S.C. § 651.
[2] We offer no opinion as to whether the sanction CSS sought is a proper remedial contempt sanction, as Broyhill didn't challenge the propriety of the requested sanction on appeal.
[3] Again, we offer no opinion as to whether this is a proper remedial contempt sanction, as Broyhill didn't challenge the propriety of the sanction on appeal.
[4] In Vela v. District Court , 664 P.2d 243, 244 (Colo. 1983), our supreme court assumed without deciding that an indigent parent had a due process right to the appointment of counsel in a contempt proceeding involving imprisonment. The court granted the public defender's C.A.R. 21 petition for relief, however, and concluded that there was no statutory authority for such an appointment in civil contempt proceedings. Id. at 245. Given that the court never reached the merits, the question of whether due process requires the state to provide counsel at an indirect contempt hearing to an indigent person potentially faced with imprisonment is one of first impression.
[5] In ruling from the bench, the trial court didn't make any explicit findings about Broyhill's current ability to pay. The closest it came was when it said, "I have no documentation of that disability and the Court finds that ... Mr. Broyhill if he made the effort would be able to get an income going and to make some payments towards his obligation towards ... his child." And the court's written order contained little more — just two conclusory paragraphs about his ability to pay. They read, in their entirety, as follows:
6. The Obligor, Joshua Broyhill, has the current ability to pay child support and has the ability to comply.
....
11. The Obligor[’s], Joshua Broyhill[’s], refusal to pay child support is willful. The Obligor has the present ability to pay child support. The Obligor offered no excuse or evidence.
[6] Broyhill expressly asked the court for appointed counsel based on indigency, so we don't reach or offer an opinion about whether a trial court must advise a parent who is facing imprisonment in a state-initiated indirect contempt proceeding that she or he may have a right to appointed counsel if indigent. In other words, because the issue of whether an advisement is required isn't before us, we save that question for another day.
[7] Broyhill also contends, for the first time on appeal, that the record doesn't support the trial court's contempt finding that CSS didn't comply with the affidavit requirement under C.R.C.P. 107(c). Given our disposition, we need not address the issue.
--------