23CA1501 RBL Financial v Layton 08-22-2024 COLORADO COURT OF APPEALS Court of Appeals No. 23CA1501 Boulder County District Court No. 21CV30778 Honorable Dea M. Lindsey, Judge RBL Financial LLC, Plaintiff, v. Main 434 LLC, Defendant-Appellee, and Concerning Angelique Layton, Other Interested Party-Appellant. JUDGMENT AFFIRMED AND CASE REMANDED WITH DIRECTIONS Division II Opinion by JUDGE GROVE Fox and Sullivan, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 22, 2024 Hatch Ray Olsen Conant LLC, Christopher J. Conant, Denver, Colorado, for Defendant-Appellee Angelique Layton, Pro Se 
1 ¶ 1 Angelique Layton appeals remedial contempt sanctions entered against her by the district court. The court held Layton in contempt after it concluded that she filed a notice of lis pendens against a piece of real property in which she claimed an interest for the purpose of frustrating the district court’s order that the property be partitioned and sold. We affirm the district court’s judgment. ¶ 2 Defendant, Main 434 LLC (Main 434), requests its appellate attorney fees and costs pursuant to C.R.C.P. 107(d)(2). We grant the request and remand the case to the district court for further proceedings. I. Background ¶ 3 While the history of this case is complex — involving at least eight different actors and three related legal actions — it revolves around a shifting mosaic of ownership interests in 432-436 Main Street in Lyons (the property). ¶ 4 We begin with the purchase of the property by Sara Toole and Chris Mattair via a warranty deed executed by Squier Realty LLC. The purchase was financed, in part, by assuming a debt that Squier owed to Sanford and Marsha Williams (Williams Note) that was 
2 secured by a first position deed of trust (Williams DOT) encumbering the property. After closing, Toole and Mattair each owned a one-half undivided interest in the property. ¶ 5 In connection with the purchase, Toole also borrowed money from Matthew Sutton. That loan was secured by a second position deed of trust (Sutton DOT) that encumbered only Toole’s one-half interest in the property. After executing the Sutton DOT, Toole became involved in significant litigation against Mattair involving the property. Layton represented Toole in that litigation.
1 ¶ 6 Toole and Mattair defaulted on the Williams DOT, and the holder of that note commenced foreclosure proceedings (the first foreclosure). Plaintiff, RBL Financial LLC (RBL), subsequently purchased the debt secured by the Williams DOT. Shortly thereafter, Toole filed for Chapter 7 bankruptcy. ¶ 7 In response, RBL sued Mattair, alleging that he was personally liable on the debt secured by the Williams DOT. RBL and Mattair 1 Layton’s law license was suspended based on her conduct during the Toole-Mattair litigation. While suspended, she continued to “guide[] her former client” and engage in other acts that constituted the practice of law. People v. Layton, Colo. O.P.D.J. No. 22PDJ032 (Apr. 19, 2023). This conduct led to Layton’s disbarment. See id. 
3 reached a settlement under which RBL dismissed the lawsuit and released Mattair from the debt obligation in exchange for Mattair’s agreement to transfer his one-half interest in the property to Main 434, an entity affiliated with RBL. Importantly, the settlement only released Mattair’s liability and not RBL’s claim to the debt. Additionally, the settlement agreement provided that there would be no merger of the ownership interest conveyed by Mattair to Main 434 and the lien interest in the property that RBL still held. ¶ 8 The bankruptcy court allowed Toole to repurchase her interest in the property from the Bankruptcy Trustee for $8,000. Layton provided the funds for the purchase. The order approving the purchase provided, “The sale of the Property IS NOT and SHALL NOT be considered a sale free and clear of any and all liens, claims, and encumbrances on the Property.” Thus, Toole regained her one-
half interest in the property — subject to the Williams DOT and the Sutton DOT. Main 434 still owned the other one-half interest. ¶ 9 RBL then recommenced foreclosure proceedings on the Williams DOT (the second foreclosure). Layton, using her own personal funds, paid RBL $125,837.91 as a cure before the foreclosure sale. In response, RBL initiated a second foreclosure 
4 proceeding because Toole’s bankruptcy constituted a nonmonetary default. Layton then paid the remaining $265,000 on the Williams DOT to RBL to cure the foreclosure. ¶ 10 While the second foreclosure was ongoing, RBL purchased from Sutton the loan secured by the Sutton DOT and commenced foreclosure proceedings (the third foreclosure). While Toole initially seemed to dispute whether she had been properly served in connection with the third foreclosure, she eventually submitted to the court’s jurisdiction by filing an answer with various counterclaims. Toole also raised claims against Main 434 and Ikon Funding LLC — another entity associated with RBL. ¶ 11 Layton moved to intervene in the third foreclosure proceeding. She argued that she had an interest in the property because she and Toole formed SA Lyons LLC for the purpose of running a restaurant there. Layton claimed that the various payments she made to cure Toole’s defaults were intended to be her contribution to SA Lyons, and, in return, Toole made an oral promise to transfer her one-half interest in SA Lyons to Layton. Toole never did so. ¶ 12 Layton’s motion to intervene in the third foreclosure proceeding was denied because (1) she failed to attach a pleading as 
5 required by C.R.C.P. 24(c); (2) she failed to articulate why Toole could not adequately represent her interests; and (3) she had attempted to intervene in a pro se capacity in order to circumvent her suspension from practicing law. After the court denied her motion, Layton used her own personal funds, in the amount of $371,433.55, to cure the Sutton DOT default. ¶ 13 With the default cured, the property was free and clear of all liens. Toole and Main 434 each owned a one-half undivided interest. The case was not over, however, because Toole had asserted counterclaims against RBL, and, moreover, she and Layton had possession of the property to the exclusion of Main 434 and were handling the property’s upkeep and receiving its tenant’s rent. ¶ 14 After repeatedly being denied access to the property, Main 434 filed a cross-claim
2 against Toole demanding a “partition and/or division” and requesting that the court appoint a commissioner to oversee the process. The district court appointed a commissioner to determine the parties’ interests in the property and recommend 2 Due to its interest in the property, Main 434 was a named defendant in the third foreclosure action along with Toole and another RBL-related entity that has not participated in this appeal. 
6 whether partition would be appropriate under sections 38-28-
103, -105, and -110, C.R.S. 2024. ¶ 15 The commissioner held a hearing at which Layton testified on her own behalf and as a witness for Main 434.
3 After considering the evidence, the commissioner found that the only parties with an interest in the property were Main 434 and Toole. As for Layton, the commissioner concluded that while she contributed significant funds to pay off the debt encumbering Toole’s interest, she acquired no interest in the property. The commissioner recommended that the district court order a partition sale because a partition in kind was impracticable, and, as a tenant in common, Main 434 had an absolute right to demand partition. The proceeds of a partition sale were to be split evenly between Main 434 and Toole, with Main 434 maintaining a right of contribution from Toole. The district court adopted the commissioner’s findings of fact and ordered the partition sale. 3 Layton did not designate the transcript of this hearing as required by C.A.R. 10(d)(3). The commissioner’s order, however, makes it clear that Layton testified. 
7 ¶ 16 Before the property could be sold, Layton filed a separate lawsuit against Toole and Main 434 seeking to relitigate the issues in the original lawsuit while asserting an equitable lien on the property. Layton also recorded a notice of lis pendens on the property, which prevented the partition sale from moving forward. In response, in this case, Main 434 filed a motion for issuance of a contempt citation against Layton for preventing the partition sale that the district court had ordered. The court scheduled a hearing on the matter. At the hearing, Layton testified that she “hoped,” but did not know, that the notice of lis pendens would prevent the sale of the property.
4 ¶ 17 The district court issued an order finding Layton in remedial contempt. It reasoned that Layton (1) knew of the partition order; (2) had the present ability to comply with the partition order; and (3) “interfered with the Court’s administration of justice by interfering with the Court’s Partition Order rendering it unable to be complied with by the parties in this matter.” It then ordered Layton 4 As noted above, Layton did not designate a transcript from the contempt hearing; however, the district court’s order referenced her testimony. 
8 to remove the notice of lis pendens and granted Main 434 its attorney fees and costs related to the contempt proceeding. ¶ 18 This appeal followed. II. Analysis ¶ 19 Layton raises five issues on appeal. We address each in turn. A. Subject Matter Jurisdiction ¶ 20 First, Layton contends that the district court lacked subject matter jurisdiction to hold her in remedial contempt because the court was deprived of jurisdiction due to an alleged irregularity with the Sutton DOT (i.e., the note underlying the third foreclosure). Specifically, Layton asserts that “the DOT filed by [RBL’s attorney] and used to begin the foreclosure contains pages that do not match the signature page.” As a result of this alleged inconsistency, Layton argues, “[T]he [district court] may never have had in rem jurisdiction over the property.” We are not persuaded. ¶ 21 We apply a mixed standard of review when determining whether the district court had jurisdiction over the underlying dispute. Levine v. Katz, 192 P.3d 1008, 1012 (Colo. App. 2006). We defer to the district court’s factual findings but review legal conclusions de novo. Id. 
9 ¶ 22 Subject matter jurisdiction concerns the “court’s power to resolve a dispute in which it renders judgment.” Ashton Props., Ltd. v. Overton, 107 P.3d 1014, 1017 (Colo. App. 2004). As such, subject matter jurisdiction may be raised at any time. McClure v. JP Morgan Chase Bank NA, 2015 COA 117, ¶ 6, aff’d, 2017 CO 22. Thus, even though Layton does not appear to have raised this issue in the district court,
5 we may review it — at least to the extent that it actually implicates the district court’s subject matter jurisdiction. See Olson v. Hillside Cmty. Church SBC, 124 P.3d 874, 878 (Colo. App. 2005) (holding that an order issued by a court lacking jurisdiction is void). ¶ 23 However, Layton cites no authority, and we are aware of none, supporting the proposition that an evidentiary issue implicates a district court’s subject matter jurisdiction. To the contrary, Layton’s claim that the copy of the Sutton DOT attached to RBL’s foreclosure complaint was not what it purported to be raises a 5 In her opening brief, Layton claims that she preserved this issue and provides general citations to two briefs she filed in advance of the contempt hearing. We could find no argument in either of those briefs that resembles Layton’s appellate argument concerning the signature page on the Sutton DOT. 
10 question of authenticity. It does not affect either the nature of the claim or the relief sought. See People v. Rodriguez, 2022 COA 11, ¶ 21 (holding that evidence susceptible of tampering is an authentication evidentiary issue). Moreover, unlike subject matter jurisdiction, evidentiary issues like authentication must be raised in the district court or else they are waived. See, e.g., Fink v. Montgomery Elevator Co. of Colo., 421 P.2d 735, 738 (Colo. 1966). Thus, authentication does not implicate subject matter jurisdiction, and any evidentiary challenge to the Sutton DOT is not properly before us. B. Contemptuous Behavior ¶ 24 Second, Layton contends that the district court exceeded its authority by finding her in contempt of court for recording a notice of lis pendens concerning the property — a statutorily authorized practice. We disagree. 1. Legal Principles of Remedial Contempt ¶ 25 Generally, appellate review of a contempt order presents a mixed question of fact and law. Hartsel Springs Ranch of Colo., Inc. v. Cross Slash Ranch, LLC, 179 P.3d 237, 239 (Colo. App. 2007). We review questions of law de novo while deferring to the district 
11 court’s findings of historical fact so long as they have some support in the record. Id. If the appellant fails to provide a complete record, we assume that the district court’s findings are supported by competent evidence. Hock v. N.Y. Life Ins. Co., 876 P.2d 1242, 1252 (Colo. 1994). ¶ 26 A district court may impose sanctions for failure to comply with court orders. See People v. McGlotten, 134 P.3d 487, 489-90 (Colo. App. 2005); C.R.C.P. 107. The district court has the inherent authority to issue orders that are necessary for the performance of judicial functions, including the power to enforce obedience to its orders through contempt sanctions. Id.; Dworkin, Chambers & Williams, P.C. v. Provo, 81 P.3d 1053, 1059 n.3 (Colo. 2003). C.R.C.P. 107(a)(1) provides, as relevant here, that contempt is the “disobedience or resistance by any person to or interference with any lawful writ, process, or order of the court.” ¶ 27 There are two types of contempt sanctions: remedial and punitive. In re Parental Responsibilities Concerning A.C.B., 2022 COA 3, ¶ 21. Punitive contempt is intended to punish the contemnor and to encourage the public not to interfere with judicial proceedings. Id. at ¶ 23. Remedial contempt is aimed at forcing 
12 compliance with lawful court orders. Id. at ¶ 24. When contemptuous behavior is committed outside the presence of the court, the court must provide notice and a hearing. C.R.C.P. 107(c). In an order holding a nonparty in remedial contempt, the court must find that the contemnor (1) was aware of the order; (2) interfered with the order; and (3) has the ability to comply with the order or remove the interference. In re Marriage of Cyr, 186 P.3d 88, 92 (Colo. App. 2008); In re Lopez, 109 P.3d 1021, 1023 (Colo. App. 2004). ¶ 28 There is no categorical limitation on the type of conduct that may constitute contempt and trigger sanctions; instead, C.R.C.P 107 renders any behavior that is disorderly or disruptive to the execution of a lawful order contemptuous. See generally People v. Aleem, 149 P.3d 765, 781 (Colo. 2007). So long as the conduct interferes with a lawful court order, otherwise legal conduct may be contemptuous. See Lopez, 109 P.3d at 1023 (nonparty’s conduct in aiding person who was subject of a conservatorship proceeding to leave the state was contemptuous); see generally Cook v. Baca, 625 Fed. Appx. 348, 355 (10th Cir. 2015) (federal courts have inherent power to regulate litigation activities with sanctions if processes are 
13 being misused or abused). Likewise, there is no limitation on who may be held in contempt of court; parties and nonparties alike must not interfere with lawful court business — otherwise, they may be held in contempt. See, e.g., Lopez, 109 P.3d at 1023. 2. Application ¶ 29 Layton attempts to argue that she was held in contempt for merely exercising her legal rights to file a notice of lis pendens on the property. However, her argument depends on false premises — that she filed the notice of lis pendens in good faith and that it was not a spurious and groundless document. The district court rejected these premises, finding that notice of lis pendens was “a spurious and groundless document.” Layton contends that this finding lacked evidentiary support, but without the transcripts from the commissioner’s hearing or the contempt hearing, we must assume that the district court correctly determined that Layton groundlessly filed the notice of lis pendens with the goal of frustrating a lawful order, and it was therefore a spurious document. See Hock, 876 P.2d at 1252. ¶ 30 We are unpersuaded by Layton’s argument that she cannot be held in contempt for exercising her legal rights because she was 
14 not, in fact, held in contempt for exercising her legal rights. Layton does not argue that the filing of a spurious and groundless document is a legal right, nor does she argue that the filing of a spurious document cannot form the basis of contempt proceedings. And rightly so. It is well established that the misuse of legal proceedings can be sanctioned. See, e.g., James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail, 892 P.2d 367, 373-74 (Colo. App. 1994) (improper recording of notice of lis pendens can constitute abuse of process if improper and for an ulterior motive); In re Skinner, 917 F.2d 444, 447-50 (10th Cir. 1990) (creditor’s suit in violation of bankruptcy stay was subject to contempt proceeding). Therefore, the district court did not err by finding Layton’s misuse of a statutory proceeding that interfered with a lawful order could form the basis of contempt as a matter of law. C. Remaining Contentions ¶ 31 Layton raises three other issues — all without merit. We address each summarily. ¶ 32 Layton contends that the court lacked jurisdiction to hold her in contempt of court because she was a nonparty. A division of our court has addressed this issue previously and concluded that the 
15 broad language of C.R.C.P. 107 — “any person” — encompasses nonparties and parties alike. Lopez, 109 P.3d at 1023. We see no reason to depart from this holding. ¶ 33 Layton also argues that she cannot be held in contempt of court because the partition order did not explicitly compel or enjoin her. But C.R.C.P. 107 prevents anyone from knowingly interfering with the execution of a lawful court order; its application is not limited to individuals explicitly named. See, e.g., Lopez, 109 P.3d at 1023 (social worker who helped remove individual subject to conservator proceedings was not compelled or enjoined explicitly). A notice of lis pendens renders title unmarketable and prevents the sale or transfer of the property until either the litigation ends or the notice is removed. Hewitt v. Rice, 154 P.3d 408, 412-13 (Colo. 2007). By filing the notice of lis pendens, Layton prevented the court-ordered sale of the property, and the district court found that Layton filed the notice for that very purpose. Therefore, she knowingly interfered with the execution of the partition order — satisfying the C.R.C.P. 107 elements for contempt. ¶ 34 Finally, Layton contends that the partition order is void because the district court lacked personal jurisdiction over Toole 
16 due to improper service of the third foreclosure complaint. Even assuming that the service was deficient, any objection that the district court lacked personal jurisdiction over Toole was waived once Toole voluntarily appeared and participated in the partition proceedings. See Gognat v. Ellsworth, 224 P.3d 1039, 1054 (Colo. App. 2009), aff’d, 259 P.3d 497. III. Attorney Fees ¶ 35 Main 434 requests its appellate attorney fees and costs pursuant to C.R.C.P. 107(d)(2), which, in connection with C.A.R. 38, authorizes our court to grant reasonable costs and attorney fees in connection with contempt proceedings. While Rule 107(d)(2)’s language is permissive rather than mandatory, we exercise our discretion in this case and grant Main 434’s request. The district court’s order noted that Layton had testified that she hoped the notice of lis pendens would prevent the partition sale. Layton’s intentional misconduct informs our decision that Main 434 should not pay the cost of her actions. We are unpersuaded by Layton’s argument that she had no alternative to recording the lis pendens notice. She could have corrected the procedural defects in her motion to intervene. Or, she could have sought to immediately 
17 appeal the denial of her motion to intervene. Likewise, she could have filed a motion to reconsider the denial of her motion to intervene with the required pleading and included a developed argument explaining why Toole could not protect her interests. Simply put, Layton had a variety of options at her disposal to represent her alleged interests. ¶ 36 Layton’s present appeal is an attempt to litigate a number of issues relevant to the contempt order; therefore, we conclude that the costs and fees Main 434 incurred on appeal are connected to the contempt proceeding. See Madison Cap. Co. v. Star Acquisition VIII, 214 P.3d 557, 562 (Colo. App. 2009). Accordingly, we grant Main 434’s request to recover its reasonable appellate attorney fees and costs. IV. Disposition ¶ 37 We affirm the judgment and remand the case to the district court for a determination of Main 434’s appellate attorney fees and costs. JUDGE FOX and JUDGE SULLIVAN concur.